This is number 2009-1299, HYNIX SEMICONDUCTOR v. RAMBUS. Mr. Srinivasan, we're ready when you are. Thank you, Your Honor, and may it please the Court. The pivotal issue in this case, as you've heard this morning, is whether litigation was reasonably foreseeable as of either of the two shred dates that are principally at issue. As of September 1998 or August of 1999, it's common ground that reasonable foreseeability is the appropriate test. And I'd like to point to what I think are the two principal considerations that weigh in favor of the conclusion that litigation was reasonably foreseeable, at least as of the date of the second shred period, although we think that litigation was reasonably foreseeable considerably beforehand. And those two categories of considerations that I would point to are, first, the strategy that Mr. Powers was elaborating, to wit, that Rambus had decided that it was in its interests to demand a royalty rate that showed, in the words of the Chief Executive Officer, that it would cost to infringe. And that was the 5% royalty rate that was referenced in a number of documents. And it was a rate that Mr. Carves said would probably push it into litigation quickly. Now, coupled with that, it's not just that the 5% royalty rate would push it into litigation quickly, but Rambus had also concluded, and this is from the February 1998 document that was referenced earlier, in which the notation is made with respect to the 5% royalty rate, that Rambus would need to litigate against someone to establish the royalty rate and to have a court declare the patent valid. So that's the first set of considerations, and that's the business strategy that is on the table for Rambus. The second set of considerations is the state of litigation planning. Because what you had, and this is reflected in the Marsh presentation to the Board of Supervisors, is you had a situation in which the litigation planning had advanced to a point that they were talking about specific theories, particular defendants, and a timer. And when you have litigation that's refined to that extent, and you have next term steps that are described in the same set of board documents to speak in terms of a document retention policy and putting together a discovery database, I think the conclusion has to be that as of that particular point in time, litigation was reasonably foreseeable. Does that mean that they could not have adopted a document retention policy at that point? At that point, it does, Your Honor. It does not, however, mean that companies can't adopt right from document retention policies in the abstract. It doesn't mean that companies can't adopt document retention policies because they have a patent. It doesn't mean that they can't adopt document retention policies because they have a patent and they have a licensing program. What it does mean is that there's no distinction between what they decide to keep and what they decide to throw out. I'm sorry? There's no distinction between what they decide to keep and what they decide to throw out. You're saying it's not a matter of how they went about it, what they chose to keep and what they chose to discard, but any policy at that point, you're saying, was too late. I do think that that's the case, Your Honor. I think that if you want to draw a distinction between what they chose to keep and what they chose to throw out, and I think there's certainly material on the record for which to draw that conclusion in this case, that exacerbates the degree of bad faith. But I think in terms of whether there's an obligation to preserve documents, which is a threshold question when you're dealing with the question of spoliation, there's an obligation to preserve documents at the point in time at which litigation becomes reasonably foreseeable. Now, there's a relevance filter. There's not an obligation to preserve documents across the board of every kind. So it's not the case that a company has to literally preserve every document. In other words, they could have adopted a plan. They could have adopted a plan. They could have adopted a plan as long as it had a relevance criterion, because I think every company has to go through this sort of assessment. And now, of course, here in this case, Judge White found that the relevant documents were destroyed. But apart from the relevance criterion, I think the fact that you have an across-the-board document retention slash destruction policy with respect to relevant documents doesn't help. At that point in time, you have to preserve relevant documents. What would happen if, in fact, a company had a document policy that said, every document which is three years old or older is destroyed? At the end of a three-year period, we destroy all documents. Does a relevancy factor have to be taken into account if there's no foreseeable litigation? No, not with respect to when there's no foreseeable litigation. I guess the way I would view it is in two steps. At the point in time at which litigation becomes reasonably foreseeable, then relevance becomes salient. Even with the general policy of document elimination? Correct. So at the point in time at which litigation becomes reasonably foreseeable, there is an obligation to preserve documents that are potentially relevant. That's the standard that the Ninth Circuit articulated in the Leon versus IDX case. So at that point, there is an obligation to preserve documents that are potentially relevant. And I think that point had been crossed by spring of 1998 and at the very latest by the fall of 1999 with the second shred day. Should that policy be as part of the original policy or can it be implemented once litigation is foreseeable at that point in time? Which part of the policy, Judge Goldman? The policy of relevancy. The policy of relevancy becomes salient. I'm using salient instead of relevant, so I don't need to do relevant squared. The policy of relevance becomes salient at the point in time at which litigation becomes reasonably foreseeable. Now, I think one way to look at it, it's a semantic question to some extent. I think you can always start out with a policy that says, in the main, we're going to destroy documents as of a certain period of time after the point in time at which the documents are created. But we have a caveat, which is that should litigation become reasonably foreseeable, we have to preserve potentially relevant documents. That, I think, is an encapsulated form what the policy should be. Now, Judge White seemed to apply a reasonable probability standard, not a reasonable foreseeability standard. And in doing so, he evaluated reasonable probability based upon the presence of a number of contingencies that stood in the way of litigation. I gather that that's a standard you think is too high. We do, Your Honor. We particularly think it's too high because of the imminence part. What's wrong with his view of the standard, reasonable probability, taking into consideration the contingencies that might have foreclosed litigation in evaluating when expoliation occurs? I think the principal problem with his analysis is when he looks at the contingencies, he's focused on the very fact that there is a contingency without regard to the likelihood that the contingency would come to pass. It seems to me that what he was focused on is a question of when litigation would ensue rather than whether it would ensue. And the fact that litigation might not ensue for some time because there are certain contingencies that have yet to come to pass doesn't cast doubt on the proposition that litigation is reasonably foreseeable. You have to look at those contingencies and you have to ask yourself, what's the likelihood that they're in fact going to come to pass? And if they tend to impugn the notion that litigation is reasonably foreseeable, then sure, I think they're salient contingencies. But I don't think Judge White engaged in that analysis. And with all due respect to him, I think if you look at the contingencies, I think they're not the type of contingencies that call into question whether litigation was reasonably foreseeable. If reasonably foreseeable is the test, then what factors should the court consider? I think that the factors that I'm pointing to in this case are the ones that I enumerated at the outset, which are the business strategy in connection with a 5% royalty rate, a royalty rate that the company itself felt would probably push it into litigation quickly, but was a royalty rate that the company needed to impose in order to establish its patent rights and establish a reasonable royalty rate. That was the company's philosophy. And in fact, I want to respond to one point, which is the question of whether that 5% royalty rate in fact was ever imposed. There are a couple of pieces of evidence that I would point the court to. One is in the Nuclear Winter Scenario Memorandum that we've heard much about in December of 1998. The analysis draws a distinction between companies as to which Rambus was unlikely to settle and had no interest in settling. And with respect to those companies, it says that the royalty rate that would be demanded would be 5% or more. So the 5% figure continues to play a role in the analysis. And then at the time of the first suit being filed against Hitachi in January of 2000, there's an exhibit in our trial record, which is at 159.007. And that is a presentation to the board on the very day that the litigation was filed. And that presentation to the board has a 5% royalty rate in it as the rate that was being demanded. That's the testimony of Mr. Tate when he's asked about that exhibit. So the 5% rate is not something that was a fleeting thought and one that went away. In fact, it exhibits a degree of consistency throughout the relevant time period, up to and including the time, the point in time at which Hitachi was sued. So Judge Wood seemed to take a pragmatic kind of approach. I'm trying to understand how every patentee hopes that the patent will turn out to be important and useful. Every patentee recognizes the possibility and perhaps the hope that in due time, there will be others who will pay for the use of that technology as well. And so you're asking us to have in our minds at least some kind of, perhaps, fact-dependent standard that we would think through that if you think you're going to ask a higher royalty than the users would be willing to pay, you'd better keep everything going back from the very beginning of the time of your invention. Whereas if you think that you're going to give it away for very little, not to worry. People will accept it. And you don't have to worry about destroying documents. I think we'll all agree that that's not a feasible standard. Well, the reasonable foreseeability standard is designed to take into account, Your Honor, different contexts, because the analysis has to be inherently so context-specific. And what I'm trying to do is point the court to the particular facts and circumstances in this case that should lead to the conclusion that the reasonable foreseeability standard had been satisfied. And the two considerations I would point to are, one, the royalty rate. But it's not just that it's a high royalty rate. It's that it's an integral part of the business strategy to impose that royalty rate. It's something that we would hope so. This is a business. I mean, you're asking us to separate this into some kind of benevolent, academic, spread the technology around. And I hear the emphasis on business strategy. But I also have the impression that there are a fair number of business strategy documents that were not destroyed, which have not been particularly helpful to the licensor either. There were some documents that weren't destroyed, Your Honor. But there were 3 million pages of documents that were destroyed, literally tons of documents. And so I'd On the advice of counsel and going back until the point in time at which the program, the destruction program, was changed. And I gather that what you're telling us is that that, perhaps with your predecessor also, that that should have been put into place sooner, not that it shouldn't have been put into place at all. Well, with respect, Your Honor, I don't think it was pursuant to the advice of counsel. I don't think that's a fair characterization of the record. In the spoliation trial, in our case, this is from November 1, 2005, there's testimony from Mr. Johnson, the attorney who would be relevant here, who affirms, and this is a quote from him, and this is at page 11, 1722, excuse me, of the transcript. Quote, I also made it clear that if Rambis were anticipating filing a lawsuit, it could not commence a document retention policy, close quote. And so the advice that counsel had given to the company, and this is necessarily before the document retention policy was commenced by the very terms of what he said, was that if you're anticipating litigation, you can't do this. And we would submit, respectfully, Your Honor, that the company was anticipating litigation, but it nonetheless commenced its document retention policy. And that would stand against the advice of counsel, rather than consistently with it. I'd also note, and just parenthetically, that in our case, at least, and this is at note six of our reply brief, Rambis had taken the position that it doesn't advance advice of counsel as a defense. So I don't know to what extent that issue is particularly salient in our case. But even if you thought it was, then we have the testimony that I pointed to that, I think, leads to the conclusion that they're not making the decision. I didn't see that in either of the decisions in Judge White's or Judge Robinson, that this was in contravention of the advice of counsel. But I think what's important, Judge Newman, is that if you look at Judge White's analysis of bad faith, there is no suggestion in that analysis of bad faith that the actions were in good faith because they were consistent with advice of counsel. Counsel is simply not mentioned in that discussion whatsoever. And I think part of the reason may be because he may have understood Rambis to have taken advice of counsel out of the equation with respect to this case. But part of the reason may have been that he was on hand when this testimony was given to the effect that Johnson had advised Rambis, Dan Johnson had advised Rambis, that if it anticipated litigation, it cannot commence a document retention policy. So I think where we're left with is that counsel drops out of the equation, and the court needs to ask the question, from what the company knew at the relevant junctures in time, was litigation reasonably foreseeable? And yes, the royalty rate is significant. And yes, because it's an integral part of the strategy, it's significant. But it's also significant that the company had presented to the Board of Supervisors a fairly detailed litigation strategy that set forth timing, that set forth theories, that set forth potential defendants, and that enumerated near-term actions that needed to be had so that the litigation plan could come to fruition. Now, when you've got that complex of considerations, we would respectfully submit that litigation is reasonably foreseeable, such that a duty to preserve documents kicks in. Now, on the question of bad faith, if I could address that, because that's come up a couple of times this morning as well. I think one important piece of evidence, and this is in both cases, but it's a joint appendix. It's trial exhibit 139.001, and it's enumerated in the district judge's, Judge White's opinion at joint appendix page 50. This is Jeff Carb's enumeration of the Q399 intellectual property goals. And there's a heading that says, licensing slash litigation readiness. And under that heading, one of the enumerated objectives with respect to licensing litigation readiness is to quote, organize 1999 shredding party at Rambis. And the fact that it's called a shredding party, and the fact that it's part of litigation readiness, to us, this speaks the kind of bad faith that's relevant and that's necessary to impose dismissal sanctions, as Judge Romson, we think, correctly concluded in this case. The very point of this document retention policy all along was not, Your Honor, Judge Newman, what you had hypothesized in a situation in which a company, when it's first starting out, puts into place a document retention policy where litigation is not on the horizon. The derivation of this policy was very much part and parcel of the litigation strategy. It was enumerated as a near-term action when the litigation plan was presented to the Board of Supervisors. And this reconfirms that even more, because a goal under litigation readiness is to organize a shredding party. And so the shredding party was part of litigation readiness. And we would submit that if the shredding party is part of litigation readiness, that is bad faith. And I have to say, in the hypothetical that Your Honor raised, Judge Bryson, I think it would be deeply troubling if it were the case that two weeks before litigation ensued, a company could avoid a finding of bad faith by imposing an across-the-board document retention policy, or at least continue to implement that policy, simply because it didn't have the specific intent to disprove particular damaging documents. Because what happens in this kind of context, and it stands to reason that part of the reason companies put into place document retention policies is because of the possibility that there's going to be damaging documents in its stores. But you still might be able to distinguish between saying that, well, that would constitute spoliation, but it would not necessarily result in the ultimate sanction of dismissal because of the absence of a specific intent to destroy relevant and helpful evidence that would be helpful to the other side. You could draw the distinction, Your Honor, but I'd have two points. First of all, I wouldn't draw the distinction. And second of all, I don't think that factual scenario maps onto what happened here, because we have some evidence to the effect that the policy wasn't neutral across the board. But the reason I would caution, I'm sorry. Go ahead. You were about to say why you wouldn't draw the distinction. Yeah, the reason I would caution against drawing the distinction, because it seems to me that it would be a very bad precedent to set to instruct companies that they could avoid dismissal sanctions. Now, to be sure, they're spoliation. But they could avoid dismissal sanctions even if they knew the litigation was on the horizon, and even if they had drafted a complaint, even if they were fully intended on going forward with litigation. But they would go ahead and destroy documents, knowing that there may well be relevant documents amongst the catch-up documents that they destroy, knowing that there may well be harmful documents in that catch-up documents, as long as they somehow assert that they don't specifically intend to destroy specific damaging documents. I don't think that's a result that would be good for the system at large. And I don't think it would lead to productive interchange between parties in the courts when we're trying to adjudicate disputes on the merits. I don't know of any case that supports that proposition. And we would suggest that the court shouldn't adopt it here. Now, the court doesn't have to deal with that sort of situation, because we've got a different set of facts at hand. But I think that that would constitute the requisite bad faith. The relevant case, for purposes of our case, is the Ninth Circuit decision in Leon v. IDX. And in that case, the court found that bad faith exists where there's willful destruction of documents that are potentially relevant. And if you apply that standard here, we think the bad faith standard would be satisfying. So please go ahead. You were giving a presentation. I was going to shift to prejudice, but I'm happy to answer a question if you. Go ahead. On the question of prejudice, the question came up whether the burden should be shifted. And I don't know of any case that suggests that you shouldn't shift the burden. Now, the one case that I think has been cited throughout much of the briefing that says that you should shift the burden is the First Circuit decision in Anderson v. Privax. And Judge White, below, cited that standard. And Judge White's prejudice standard, I think, has to be understood through the lens of the fact that he didn't shift the burden on prejudice because he found that there was no spoliation in the first place. If he had found that there was spoliation, he would have shifted the burden. And if he did shift the burden, I think the conclusion would be that we would have established prejudice because I think it would be very difficult for Ramis to show, by clear and convincing evidence, that there was no prejudice, given the scale of the destruction that we had. Is it sufficient to shift the burden simply by finding spoliation? Or must there be a finding of bad faith? Well, you could say that there has to be a finding of bad faith, Your Honor. And I think there is and there should be a finding of bad faith. You're not equating spoliation and bad faith. I'm not equating the two, no. I think there's a further inquiry that can be had at the remedy stage, as has been outlined earlier. But from our perspective, whatever needs to be shown in order to shift the burden on prejudice, that should have happened here. And once you shift the burden, I don't think Ramis can show by clear and convincing evidence that there wasn't prejudice, given the scale of the destruction. Does the burden shift automatically, then, if you do find spoliation? If you find spoliation, and I think you could ask the question whether the spoliation was intentional, willful, whatever the relevance of that. Does it have to be coupled with bad faith? Right. Well, I think you could say that it's coupled with bad faith. I don't know that the case is entirely clear on that. But even if you did say that it was coupled with bad faith, then that would be satisfied here. In the Ninth Circuit, under Leon v. IDX, it's willful destruction of potentially relevant documents. And I think at that point in time, you would shift the burden on prejudice. But the burden should have been shifted, in this case, and once the burden does shift, I think we have the better of. But there was no finding of spoliation here by Judge White. There wasn't a finding of spoliation. So there could be no shifting of the burden at that point. Exactly. And in Joint Appendix pages 116 and 148, Judge White explains that the reason he didn't shift the burden on prejudice is because he didn't find spoliation. And I think he explains in his opinion that had he found spoliation, he would have shifted the burden on prejudice. So you would say, then, that you would need to find all three factors before you shift the burden. First, you find spoliation, then the aspect of bad faith, and once that's found, then you shift the burden on prejudice. At most, I would say you would need to find spoliation, and then you could say you need to find bad faith. Once you have that, then I think the burden has to be shifted, because the burden, it seems to me that it's terribly unfair to put the burden on the party that didn't spoliate the documents to show how documents, the contents of which it doesn't know, were non-prejudicial to it. It seems to me the only logical way to construct the standard is to require shifting of the burden, since the party that's in the best position to know what documents it destroyed then has to come forward to show that the documents it destroyed were non-prejudicial. And it's not unheard of for companies to have policies under which they destroy documents, but they keep some sort of log or something that at least gives some indication of what sorts of things are being destroyed. And none of that happened here. We have no record whatsoever of what was the contents of the 3 million pages and tons of documents that were destroyed pursuant to this policy. With respect to bad faith and prejudice, do you agree with the proposition that the two should be viewed and balanced, one against the other? If there's a strong showing of bad faith, then a moderate showing of prejudice is sufficient? It seems to me that's a perfectly sound way to construct the analysis, Your Honor. I think the court has the freedom to do it, because particularly with unclean hands, the court is exercising its discretion and equity. And equitable analysis, I think, is consistent with taking into account these sorts of considerations on a sliding scale basis. We do have other examples of balancing of that sort in slightly different contexts in equitable conduct that we're going to visit again soon, where balancing materiality and intent. And that balancing test has seemed to generate a fair bit of controversy. Are you suggesting that we should embark upon another adventure in balancing here? Well, I don't believe that this asking whether we should embark on an adventure in balancing seems to assume the answer. The question, with all due respect, I wouldn't suggest that you would embark upon an adventure that would lead to controversy. It just seems to me that it's not terribly controversial in this particular context to say that we would take into account degree of bad faith and degree of prejudice and consider both of those before we decide what sort of sanction we're going to impose. The court has no further questions at all. Now, we will save you a little time, Mr. Shulkinson. Thank you. Mr. Tarangio. Thank you, Your Honor. Excuse me, Your Honor. In this case, unlike in the Micron case, we have a whole series of detailed findings rejecting all or nothing unclean hands defense, no question of lesser remedies. This is all or nothing, in which Judge White found multiple bases that provide independently sufficient reasons to reject the unclean hands defense. And in particular, of course, the findings of no bad faith and no prejudice must, at least together, suffice to justify the rejection of unclean hands for what is, after all, a terminating sanction for a neutral policy for pre-litigation destruction. Now, let me talk a little bit about some aspects of that. Bad faith is talked about in the cases in at least two different ways, neither of which is present here. One is selective identification of documents you think are harmful and destroying those because they are harmful. Or, and this is encompassed in what rarely means in the civil context, an awareness of some duty violation, of awareness of wrongdoing. I think there may well be cases in which one or the other might suffice for a finding of bad faith. We have neither one of those. There is not a single bit of evidence in the Heineck's record of any focusing on particular documents as worrisome and therefore warranting destruction. I will note that the one piece of evidence that is in the Micron case, which we heard about this morning, that raises at least an issue, this hample testimony, is not in the Heineck's case. There is nothing in the Heineck's case that suggests, and Judge White specifically found, there is no evidence that Karp or anybody else looked at what Rambis might have in its files, on its email servers, in its documents, and said, boy, this could really hurt us. We have to get rid of it. There is also no evidence, and this may go a little bit to your question, Judge Rice, in that you're hypothetical about two weeks before suing or two weeks after an accident. There is also no evidence that anybody at Rambis thought, in the face of prominent counsel's advice, that there was a preservation date triggered. Certainly not in the spring of 1998, when counsel, outside counsel, is the one suggesting adopt a policy and providing the template and doing it specifically in the context of considering potential licensing with potential follow-on litigation. This is not some in-the-dark counsel about the potential for litigation. The best legal advice at the time on this inherently imprecise question about when a litigation hold needs to be placed under a neutral policy without ad hoc targeting before litigation commences is, even if you're considering the potential for litigation, as to which there are numerous contingencies, including the major contingency that gives you a powerful reason not to sue. Don't rock the boat. The best legal advice at the time is, go ahead, adopt this neutral policy. I approve the slides. Dan Johnson is examining the slides. The formal policy is adopted as a small variation without any contention that it's a material variation from the template that the Cooley firm provided to Rambis. And the slides themselves, some of which Johnson himself presented to Rambis, explain the various reasons for this neutral policy, including the, quote, horror stories of certain bad emails and certain other cases that have come back to bite litigants. Rambis, at this point, is doing nothing that is remotely unreasonable on any view, looking back then, about a neutral policy and pre-litigation destruction. What, if anything, does the record reflect about what Johnson said to the Rambis people at that point about when, if ever, that policy had to be varied in the context of impending litigation? He used various phrases like anticipated litigation. I know that that's one of the phrases he used. I don't remember the other phrases. But it was the kind of phrasing that we're talking about here. He did explain there is an exception to the policy. Yes. Yes. Absolutely. Mr. Tarantello, is there also a quote from Mr. Johnson saying that the 5% rate would entice litigation, would essentially bring litigation on, because it was such a higher royalty rate? A couple of things about that. It's undisputed, and Mr. Johnson testified that in this meeting, which included two senior licensing attorneys from the Cooley firm at the time, both of whom had spent a quarter century at IBM, I think Johnson and those licensing attorneys said, 5% is crazy. I think the word hilarious was used at one point. And the notes that you are talking about do, in fact, reflect some thought. They're just notes, so they're not precise about verbs, about how if you actually asked for a 5% royalty, that's the kind of rate that we former IBM people would say, nobody's going to pay that. It is also the case, notwithstanding, I think, the carefully worded reference to some document in the record that wasn't apparently significant enough to raise in the brief, I think it is also undisputed that there is no evidence whatsoever that Rand has ever asked anybody for 5%. Not the first time with Hitachi, not later. So it is true that in the spring of 1998, part of the context in which prominent counsel Dan Johnson is advising, you need this policy, here are the slides, go out and present this to your people, they are neutral on their face, nothing is distinguishing helpful versus harmful. Judge Robinson's word helpful, not the documents. And when Mr. Carr showed the slides with look for things to keep to Mr. Johnson, Mr. Johnson didn't say, ah, you've now skewed it. You're now selectively choosing things that are going to skew the litigation record. Instead he said, you're just asking for these pack rat engineers, I think was his term, to keep everything. You've got to tell them. You can't say look for things to keep, look to make judgment calls in favor of keeping, or they're going to keep everything. So it is in the context of considering a specific potential licensing and litigation eventuality, the potential being greater if they ever actually did ask for 5%, that the best legal advice at the time is saying, go ahead and adopt this policy. Now, just what I think should be a minor point. There is a finding at JA 77, and ample evidence to support it, that this kind of volume of shredding and shred days with pizza at the end are utterly normal in the industry. The bigger the company, the bigger the effect. And sheer volume can't mean anything. In the Third Circuit, Hechinger case. Hechinger, after it filed for bankruptcy, promptly destroyed, essentially, all of its paper documents. And the Third Circuit, nevertheless, says a sanction, even this is not ugly man, a sanction is inappropriate because there's no reason to think that what's missing here actually would materially change the record on which the adjudication is to be based. Volume alone is insignificant. Mr. Taranto, I'm still somewhat concerned about the strategy that was established, whether it was March or by December or otherwise. I think March could be a date, but I think December, as Judge Robinson found, was the date when the duty arose. When you couple the strategy of licensing with the strategy, the business strategy, of making sure that the DRAM is essentially infiltrated throughout the industry before you begin the SRAM type of litigation or licensing project, when you couple those two together and you do have to wait a period to make sure that your DRAM is in the industry and it's accepted as a standard, but now you have the SRAM, which is a competitor. You want to make sure that that competitor is kept out of the marketplace. You change your claims and you proceed accordingly, and then all of a sudden you have a straight litigation strategy. When does that duty arise to preserve documents? When the strategy is implemented or when the strategy is presented to the senior management of the company? Let me try to answer that this way. Any rule that this Court announces is going to be a new clarification of what was at the time and I think will remain inherently imprecise about whether it's foreseeability or probability, which makes absolutely essential to any IP company and indeed to businesses more generally an important enforcement, a meaningful enforcement of a bad faith and prejudice requirement. Let me get back to the question. The strategy by this one guy in the company is a strategy of what if. We will want to have a strategy ready to go in case it makes sense. But the in case is a big, big in case. Getting the patents, A, took a long time and was never an assured thing. Some of the patents are implementation specific or otherwise needed the product to reverse engineer to see what was actually going to be in them. More important than anything else is that the company's strategy was make RDRAM, the specialized Rambus version of all this, the victor in the market, largely driven by what Intel was going to do. And the CEO, Tate, testified several times that if that happened, there might be no reason at all to invoke the patents on if we ever got them, on the non-compatible DRAMs against the very companies that were building the RDRAM. And indeed, that was a tremendously important business decision. The nuclear winter scenario document on which Judge Robinson placed something like exclusive reliance expressly says on the last page, suing your most important partners is a big deal. They will never be cooperative again. When there is a major affirmative reason for the company not to actually trigger a licensing and potential litigation strategy that it has created so that if it made sense to trigger, it would be on the shelf ready to go. In that situation, then the difference between we might sue, we've decided to sue, is, well, it's somewhere in the middle, more than we might sue and here are those circumstances which we can't predict yet, under which we will, if they ever come to pass. You said one item, which I would put some interest on, might sue or will sue. But if I put it on the shelf and I'm ready to sue for it, doesn't that make me a required person to present and preserve the documents that I have at that particular point in time? No, it doesn't because... If I have it on the shelf, the entire strategy is on the shelf. Right. And it's done, let's assume, on January 1st. On January 31st, I pull the trigger. It's ready. Does my duty arise on January 1st or January 31st? I think one needs to know more. I think that the closer one gets... Hypothetically, the way I've posed it. Well, I assume you're going to have some history in which this January 1st completion of the strategy was just implemented over the Christmas season and there's been some urgency because we really need to have it in place because we're pretty serious about pulling the trigger on January 31st. Then I think one may be getting closer to Judge Bryson's hypothetical where an inference of awareness of a duty to preserve is a pretty readily drawn inference. We don't have that at all. And indeed, Judge Robinson, again, declined to view, consistent with Attorney Dan Johnson's advice in the spring of 1998, the creation of this strategy to put on the shelf as anything out of the ordinary triggering a preservation duty or vast numbers of IP-owning companies who only IP for the purpose of seeking licenses with the inherently possible backup of litigation are going to be caught in this. You're absolutely correct. January 1st to January 31st would be difficult. So you would need a previous time period during which you would need to prepare for litigation and the documents for litigation and otherwise. So if it's prior to January 1st, does that mean that when you make the decision, the strategic decision to protect your marketplace, at that point in time, does your duty arise? I think that I'm going to answer yes to that unless I'm missing some aspect of the question. If a company has decided to sue, No, that's not what I said. Not decided to sue. Decided to protect its marketplace. To protect its marketplace. I'm having a little trouble understanding that. It protects the marketplace by threats, by licenses, and also by litigation. So from that perspective, if I'm trying to protect one portion of my market and I strategize that those are the three prongs of my approach, that's my strategic goal is to protect my marketplace, but I have three prongs to it. Does my duty arise to protect those documents and preserve those documents when I make that decision to proceed? Let me see if I can answer it this way. I can imagine, but not all that readily, a circumstance in which a patent holder, which is after all a holder of nothing but a ticket to sue, that's what a patent is, a ticket to go to court and exclude, or collect damages for a violation of the right to exclude. Or a license. But the threat behind a license is always the fear of the taker. I'm likely to sue. Now it's possible that you can have a world in which you have a patent holder and in a particular marketplace, going to somebody and saying, I want a license is so likely to produce a license that the litigation backstop as a threat is not really in the picture. That's not going to be the case in many, many situations. And so the licensing and the litigation will be reasonably close. Now, it may depend on the particular kind of defendant. A defendant like Hitachi, for example, which was not particularly interested in the RD-RAM product. Maybe it's easier to decide, I'll litigate against them if they don't take the license, than a Micron or a Hynix, which was apparently quite interested in the RD-RAM product and you don't want to alienate them. Or Intel for that matter, right? Right, suing Intel I think was not a happy prospect. Not really a happy prospect, right. And I guess, so I guess I want to come back to and maybe just wrap this up. Whatever the court says on a forward-looking basis about how to draw this line about pre-litigation, neutral implementation of a policy, the one thing that I think it cannot do is overturn Judge White's findings of lack of bad faith in either of the two relevant sentences, lack of prejudice, and Judge White specifically found that Rambis actually established that nothing material was missing. In this case, it becomes unimportant, therefore, whether whatever the precise formulation of reasonable foreseeability, reasonable probability, both are expressions that Judge White used because in the absence of both bad faith and prejudice, you cannot have a terminating sanction of unclean hands and there is no middle ground that Hynix has asked for either in the district court or in this court. Thank you. Thank you, Mr. Taranto. Mr. Schneebasen. Well, let's try and stick to our time limit for the rebuttal. Sure, I will, Your Honor. I have three sets of points that I'd like to address briefly in rebuttal. The first deals with a set of contingencies that Mr. Taranto outlined, some of which were outlined in Judge White's opinion that by hypothesis would show that litigation was not reasonably foreseeable. And I just want to go through those very quickly and also add a gloss on the respect of what Judge White himself said. I don't think that the court should rely on the fact that the particular patents hadn't issued. It seems to me it's dangerous to go down that road because a company could very well anticipate that patents would issue, and as in this case, they might well have patents that have already issued that they think would support claims. Now, of course, there might be better ones that come along, but here if you look at the nuclear winter scenario memorandum, the company had already concluded that it had patents that it believed had been infringed, and it seems to me that that should be enough. Second, on the point that was asserted to the effect that the company might never have gone into litigation if the RD-RAM product had gained industry-wide acceptance, that I think is contradicted by Judge White's own findings. If you look at page 17 of our reply brief and page 81 of the joint appendix, what Judge White found was that Karp said that we wouldn't go down that road until RD-RAM reaches the point of no return. So the plan all along was to go to litigation to assert patent rights as against SD-RAM and DDR-SD-RAM, but the company made the decision not to assert those rights until it had the opportunity to push the industry to accept RD-RAM, which makes economic sense, but I think it shows that litigation was all the while going to be awful. Now, one particular point I'd like to make about Judge White's analysis of the contingencies is, and I think it illustrates that what he was focused on was the question of when litigation would ensue rather than whether it would ensue, is that he said what he characterized as even more telling is that there was no budget as of yet for litigation, which to me clearly is a when question rather than a whether question. The fact that there did not happen to be a budget yet shows that litigation wasn't going to happen today, but it doesn't cast doubt on the likelihood that litigation would ensue at a point in time at which they had got everything in a row. There's no sense that the budget would not at that point have been approved, and so I think that shows that Judge White was focused on when rather than whether. Now, on the issue of prejudice that was mentioned towards the end of the argument, one important consideration to bear in mind about Judge White's prejudice analysis is his prejudice analysis is largely based on the conclusion that some documents in various categories of documents were produced, and to him, he thought that meant there couldn't be prejudice, but we think that's a legal error. The fact that some documents in categories were produced doesn't tell you anything about whether there were other documents in those very same categories that weren't produced, many of which could have been explosive. Now, of course, we don't know that for sure, but that's because we haven't seen the documents because all of them were destroyed without any record. Finally, with respect to the 5%, and I'll make this very brief, the notion that 5% was just a fleeting hypothetical that was never going to be followed through on is belied by the fact that after Mr. Johnson and the company had an exchange, which, as Mr. Toronto described, elicited a reaction from Mr. Johnson to the effect that that was sort of hilarious that they would consider 5%. Well, 5% was presented to the Board in March, so if 5% wasn't serious, I doubt that it would have been in the Board presentation materials, and then, as I said earlier, it was presented in the Nuclear Winter Scenario Memorandum as the rate that would be imposed as against companies as to whom they were not interested in selling, and it was reflected in the contemporaneous document, the Hitachi suit, that was in Exhibit 159.037. If the Board has no further questions. Thank you. Thank you both. Both cases are taken under submission. All rise.